1998 OK CR 30

Barney MARSHALL, Jr., Petitioner,

v.

STATE of Oklahoma, Respondent.

No. C–91–463.

Court of Criminal Appeals of Oklahoma.

May 12, 1998.

Michael Tullius, Oklahoma City, for Defendant at trial.

Robert Macy, District Attorney, Ray Elliot, Assistant District Attorney, Oklahoma City, for the State at trial.

Cindy Brown, Appellate Defense Counsel, Norman, for Petitioner on appeal.

Susan Brimer Loving, Attorney General, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for Respondent on appeal.

## *OPINION DENYING PETITION FOR CERTIORARI*

JOHNSON, Judge:

¶1 Barney Marshall, Jr., Petitioner, pled guilty to the crimes of Murder in the First Degree with Malice Aforethought, in violation of 21 O.S.Supp.1982, § 701.7 A (Count I) and First Degree Rape (Count II) in the District Court of Oklahoma County, Case No. CF–90–3512. After a sentencing hearing in which evidence was presented as to aggravating and mitigating circumstances, the Honorable Carolyn Ricks, District Judge, found the existence of two aggravating circumstances, that the murder was especially heinous, atrocious or cruel and that Petitioner would constitute a continuing threat to society. After finding that the mitigating evidence did not outweigh the aggravating factors, the court sentenced Petitioner to death for First Degree Murder and to forty-five (45) years imprisonment for First Degree Rape. Petitioner moved to withdraw his guilty pleas within ten (10) days of the pronouncement of the sentences. The motion was denied. Petitioner has timely filed a Petition for Writ of Certiorari regarding the validity of the pleas and the accompanying sentences.

### Facts

¶2 On the evening of June 21, 1990, between 7:30 and 8:00 p.m., Petitioner, the victim Helen LeFlore, and her sister Rudy, visited the home of Timothy Gene Bigman and Richard Tiger in Oklahoma City. Mr. Bigman testified that Petitioner and Helen, who was thirteen (13) years of age, drank beer and whiskey until 9:30 or 10:00 p.m., when Petitioner, Helen and Bigman left to walk to a corner store to make a telephone call. After Bigman had been on the telephone for approximately thirty (30) minutes, Petitioner told Bigman that he was going to take Helen home. Petitioner returned to Bigman's residence at approximately 11:00 p.m. alone. He told them that some gang members had seen him at the corner store and chased him through the creek. Tiger testified that Petitioner was "pretty much drunk" and that Helen was "messed up more than he was."

¶3 On the morning of June 22, 1990, Helen's body was found in the creek bed below the bridge in the 1600 block of Southwest 23rd Street in Oklahoma City. She was immersed face down in the water and her body was nude except for a T-shirt and bra that had been pushed over her breasts. Dr. Larry Balding, medical examiner, arrived at the scene, took custody of the body for autopsy and based on information previously furnished to him by the police,[1] determined the cause of death to be asphyxia from drowning. Dr. Balding noted that it was possible the victim could have died as a result of the aspiration of food,[2] which also

---

1. Dr. Balding explained that with no history and just the injuries he saw, he otherwise would have no way of determining the cause of death.

2. Dr. Balding found food material in the tertiary bronchiolus similar to that of the stomach, which "implies to me that at some point, she, if you will, vomited and then, in gasping or breathing, sucked that into her airway."

would be an "asphyxial-type death." Dr. Balding found extensive antemortem injuries consisting of bruising, lacerations and abrasions on the face, back, legs and a few areas on the arm, but no severe internal injuries.

¶ 4 The postmortem injuries consisted of three gaping stab wounds on the right side of the chest, two on the left side of the chest and the throat split all of the way through the airway. The victim had a blood alcohol level of 0.52% and a vitreous alcohol level of 0.19%. However, Dr. Balding stated that the alcohol level can be much greater after death because of postmortem formation of alcohol, which is a product of the action of bacteria on the sugar in the body. When asked whether any intercourse occurred, Dr. Balding could not say with any degree of certainty. Swabs of the vaginal area were normal and revealed no evidence of sperm;[3] and there was no evidence of trauma to the vaginal area. Other facts will be revealed in the relevant assignments of error.

### Acceptance of the Pleas

■ ¶ 5 In his first assignment of error, Petitioner contends that his confessions were obtained in violation of his constitutional right to remain silent because he was incapable of making a knowing and voluntary waiver of his Fifth Amendment rights and because, after the purported waiver, he exercised his right to cut off questioning. Petitioner asserts that at about 5:00 p.m. on June 22, 1990, at the time of his interrogation, he was impaired due to liquor intoxication. He argues that the taped interview reveals his significant impairment as exhibited by his "slurred speech, slow thought process, and incoherent and rambling non-responsive answers to questions asked by the officers."[4]

¶ 6 Petitioner also asserts that he was twenty-one years old with less than a seventh grade education, a hearing impairment and low scores in verbal categories and intelligence. He had been placed in classes for the learning disabled when he was in school.

Thus, he argues, these circumstances, together with the refusal of the officers to honor his requests to stop the interrogation and their persistent pressure to make him confess, render his confession involuntary. Petitioner acknowledges that approximately thirty (30) minutes into the interrogation, he was read his *Miranda* rights and was asked if he understood. Although he responded, "Yeah," the officers never asked if he wanted an attorney or wished to remain silent. Instead, he was immediately asked, "Having these rights in mind, do you wish to talk to us now?"

¶ 7 We have viewed the taped confession in its entirety and find that the totality of the circumstances surrounding the interrogation reveal that Petitioner understood the *Miranda* rights and made an uncoerced choice to waive those rights with complete awareness of the nature of his rights and the consequences of waiving those rights. *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410, 421 (1986). Additionally, we do not find that Petitioner made a request, **equivocal** or otherwise, for an attorney. This Court has held that although the Supreme Court suggests it is good police practice to clarify any **equivocal** request for an attorney, it is not required. *Mitchell v. State*, 884 P.2d 1186, 1193 (Okl.Cr.1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

¶ 8 Petitioner also claims that the invocation of his Fifth Amendment right to remain silent when he unequivocally requested to terminate the interview was not scrupulously honored by the interrogating officers. He points out the following:

ALLEGED REQUEST 1: After the interrogating officer persisted in his efforts to elicit "the truth" from Petitioner about whether and how he killed the victim, the following takes place:

MARSHALL: I've told you everything I know.

INV: No, you haven't, Cool B. You haven't told us everything. We can prove

---

3. According to Petitioner's confession, he did not ejaculate because the victim started crying and told him to get off of her.

4. After asking a few preliminary questions, the officer asked Petitioner twice if he was drunk. Both times, Petitioner responded, "Yeah."

that you haven't told us everything. We can prove that. Beyond a shadow of a doubt we can prove that you have not told us the truth.

MARSHALL: Well, ———

INV: ——— attitude to have—

MARSHALL: You all want to be told the truth? All right, I killed her. I did kill her. I killed her, which I didn't, but you all want me to say it, but which I didn't.

INV: I don't want you to say anything other than the truth. I told you why

———

MARSHALL: Just take me on to jail if you all think I killed her.

INV: O'K. And if you decide later on you want to tell us exactly what happened, you're going to have to contact us and let us know that, O'K?

MARSHALL: How am I supposed to do that?

INV: Tell the jailer. Because I believe that you did kill her. The only thing I don't know, Cool B., is why did you kill her. I don't know what happened. I don't know if you deliberately said I'm going to kill this 13 year old girl. [Petitioner gets up to be taken to jail] Sit down. No one told you to get up, did they? I'm going to run this thing over and get it in the lab, Jay [fellow officer].

MARSHALL: Will I get my shoes back?

INV: Nope. Not until tomorrow, Cool B.

[At this point the officers leave Petitioner alone in the room. Petitioner mumbles to himself, "[t]hat's what the bitch gets for fucking with me."]

**ALLEGED REQUEST 2:** The non-interrogating officer returns and the following ensues:

MARSHALL: Are you taking me in?

INV: No. I want to sit down and talk to you for just a minute. Barney, I really didn't get a chance to talk to you awhile ago. I was in here, but I really didn't get a chance. There's a few things I wanted to talk to you about.

MARSHALL: I don't want to talk about it now.

INV: Well, you don't want to hear it, and I understand that, but I would like to talk to you. Are you still willing to talk to me? I wanted to just point a few things out to you. Maybe I can help you to understand a few things. Do you want to talk to me?

MARSHALL: Sure, why not. ——— inaudible ———

[For the next twenty minutes, the officer persistently urged Petitioner to just tell him the truth. Petitioner agreed to talk if he could have a drink of whiskey. He was refused. He then agreed to tell everything if the officer would get his $5 from his friend Mike, who had accompanied him to the station.]

¶ 9 We have considered the instances in question and do not find that Petitioner unequivocally invoked his right to remain silent. Based on the foregoing, this proposition is denied.

¶ 10 In his second proposition of error, Petitioner contends that the use of his confession as the factual basis for his pleas was improper and erroneous because the confession was obtained in violation of his constitutional rights. Having found that Petitioner's confession was valid, this proposition is moot. Accordingly, we deny this proposition of error.

■ ¶ 11 In his third assignment of error, Petitioner urges that his plea of guilty to First Degree Murder was not "knowing" because it was predicated on the trial court's misstatement of law. Specifically, Petitioner refers to the following statement made by the trial court:

Do you understand that **on a plea of guilty,** you may be sentenced to **a term of imprisonment** within the limits that I've just told you? (Emphasis added.)

Petitioner claims that this pronouncement, along with his counsel's advice that he would fare better pleading guilty rather than going to trial, convinced him that he would not receive the death penalty and induced him to plead guilty.

¶ 12 A review of the transcript reveals that the statement in question was applicable to the rape charge. Prior to informing Peti-

tioner of the possible sentences on the rape charge, the following colloquy took place:

> THE COURT: Do you understand that the punishment provided for the crimes you are charged with are as follows: For MURDER IN THE FIRST DEGREE, the punishment provided by law is death, life without parole, or life.
>
> MR. MARSHALL: Yes.

Based on the above and the "Plea of Guilty Without Sentencing Summary of Facts" form signed by Petitioner, we find Petitioner's plea was entered knowingly. This proposition fails.

### COMPETENCY TO STAND TRIAL

¶ 13   In his fourth assignment of error, Petitioner challenges his competency to stand trial. An accused is presumed to be competent to stand trial. 22 O.S.1991, § 1175.4. He has the burden of proving his incompetence to stand trial by a preponderance of the evidence. *See Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996); 22 O.S.1996, § 1175.4(B). The record reveals that pursuant to the granting of his motion for competency evaluation, a competency examination was performed by Dr. Edith King who found Petitioner competent to stand trial. However, no post-examination competency hearing was held as legislatively mandated [5] and Petitioner asserts that he did not affirmatively waive the hearing. We remanded for proper determination of the issue and on October 23, 1995, the jury found Petitioner had not proven by clear and convincing evidence that he was incompetent to stand trial. However, in *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the United States Supreme Court held the *"clear and convincing"* standard violates a defendant's right to due process, and that the proper standard is a "preponderance" of the evidence. Pursuant to *Cooper,* this Court again remanded the case to the District Court of Oklahoma County to determine whether it was feasible to conduct a retrospective hearing on Petitioner's competency to stand trial at the time of trial using the correct standard, and if so, to hold the hearing.

¶ 14   On October 29, 1996, the Honorable Richard W. Freeman determined that such a hearing was feasible, and on March 3, 1997, the Honorable Virgil C. Black conducted a retrospective post-examination competency trial by jury. The jury found Petitioner had not proven his incompetency by a preponderance of the evidence and that Petitioner was competent during the time of his plea of guilty on January 28, 1991, through sentencing on April 25, 1991.

¶ 15   Petitioner raises five supplemental claims. First, he claims the jury's finding is erroneous because the jury was never required [and Oklahoma competency statutes do not require] a determination of whether he had *any* understanding of the *proceedings* against him. Petitioner bases his claim upon the following jury instructions and verdict form which were given in this case:

**INSTRUCTION NO. 3:**

The first question on the verdict form that you must answer is, "Was Barney Marshall able to appreciate the nature of the charges against him . . . ."

The next question is, "Was Barney Marshall able to consult with his lawyer and rationally assist in the preparation of his defense . . . ."

**INSTRUCTION NO. 4:**

1. "Competent" or "competency" means the present ability of a person arrested or charged with a crime to understand the nature of the charges *and proceedings brought against him* and to effectively and rationally assist in his defense. (Emphasis added.)

**VERDICT FORM:**

1. Was Barney Marshall able to appreciate the nature of the charges against him on the date of the plea of guilty which was January 28, 1991, through the sentencing on April 25, 1991?

At the time of the plea, absent an expressed waiver, an accused's right to a jury trial on the issue was mandatory. *See Scott v. State,* 730 P.2d 7, 9 (Okl.Cr.1986).

---

**5.** This statute, 22 O.S.1991, § 1175.4, was amended subsequent to Petitioner's entry of his pleas and now requires an affirmative request for a hearing. See 22 O.S.Supp.1996, § 1175.4(A).

Yes _____

No _____

2. Was Barney Marshall able to consult with his lawyer and rationally assist in the preparation of his defense on the date of the plea of guilty ...?

Petitioner contends that Instruction No. 3 and the verdict form required the jury to consider only his ability to understand the nature of the *crimes charged* and not also *the proceedings brought against him.* Additionally, Petitioner claims there was no evidence presented from the State to show that he understood the *proceedings against him,* i.e., the guilty plea proceedings. In support of this claim, Petitioner points out that immediately after he was sentenced to death, a newspaper reporter saw him turn to his attorney and heard him say, "Now, when do I get to go home." Petitioner asserts this clearly demonstrates that if he had a rudimentary grasp of the proceedings and understood what he was pleading to, he would not possibly have made that comment.

¶ 16   It would have been best had the jury been instructed to determine whether Petitioner understood the nature of the proceedings against him. However, under the facts of this case, error, if any, is not cause for reversal. Our review of the record reveals that Dr. Edith King, who performed the pretrial competency examination, elaborated on Petitioner's understanding of the legal proceedings against him. Additionally, Petitioner's trial counsel testified that he believed Petitioner understood the nature, purpose, and consequences of the proceedings, as Petitioner had answered during the questioning by the trial judge. Because the evidence in this case strongly supports the finding that Petitioner knew the nature of the proceedings and possessed a rational understanding of them, we deny this claim. Likewise, we decline to reconsider our holding in *Tate v. State,* 896 P.2d 1182 (Okl.Cr.1995) and *Lambert v. State,* 888 P.2d 494 (Okl.Cr. 1994), where we rejected the argument that the Oklahoma statutes do not require a defendant to have a *rational as well as factual understanding* of the proceedings against him as long as he understands the nature of them.

¶ 17   In his second supplemental claim of error, Petitioner contends the trial court's finding of feasibility to hold a retrospective competency hearing was erroneous because rather than holding a feasibility hearing, the trial court relied on the records of his 1995 feasibility hearing and competency trial to determine the feasibility of the 1997 proceedings. The record reveals that at the scheduled hearing on the feasibility to hold a retrospective competency trial held on October 2, 1996, the trial court heard several motions argued on behalf of Petitioner. One motion was for a continuance due to Petitioner's counsel announcing that he was not prepared, that he had filed for an extension in this Court, and that his client was not present. The trial court denied the continuance. On October 3, 1996, at the beginning of the proceedings, the trial court announced that this Court had granted Petitioner a thirty-day extension and set the feasibility hearing for October 28, 1996. Petitioner's counsel again announced not ready for the reason that he had just received approval for his contract to represent Petitioner and approval to hire expert witnesses in the case. Petitioner's counsel believed that he needed his experts to determine if it was feasible to conduct a retrospective competency trial. The State pointed out that Petitioner had the benefit of two experts at the competency trial held one year earlier and that not only were they, but also all the other witnesses at that trial, available and ready to testify. Rather than call the witnesses again, the State offered as exhibits the record and transcripts of the feasibility and competency proceedings held in October 1995. Petitioner's counsel objected that there had been no showing of unavailability of the witnesses under 12 O.S. 1991, § 2803 of the Evidence Code and that the expert opinions may "well be incomplete opinions" and may not be relevant. The trial court denied the continuance and found it feasible to conduct a retrospective competency trial.

¶ 18   The record reveals that District Judge Richard W. Freeman who conducted the feasibility determination was the same judge who presided at the retrospective competency trial held one year prior. He had

personal knowledge of the prior proceedings as well as the record and transcripts of those proceedings. The Prosecutor testified that her witnesses were available and ready to testify and that she personally talked to Petitioner's two experts who testified at the prior proceedings and who indicated they were available and ready to testify. We find these circumstances to be similar to those in *Boltz v. State*, 806 P.2d 1117, 1121–1122 (Okl.Cr.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). As we found in *Boltz*, "[w]ith such a wealth of available evidence, the trial court properly determined that a retrospective competency determination was feasible." *Id.* Petitioner's second supplemental claim is denied.

¶ 19  In his third claim, Petitioner asserts that trial court abused its discretion by allowing a psychiatric expert to give a legal opinion and by allowing a lay witness, not offered as an expert, to base his opinions and testimony upon inadmissible hearsay. We have reviewed the instances cited by Petitioner and do not find, as to the cross-examination of Dr. Smith, the questions propounded to him required him to give a legal opinion or an opinion of any legal definition, defense, strategy, or theory. The questions propounded merely sought to elicit the nature and extent of Dr. Smith's familiarity with Petitioner and Petitioner's state of mind at the time of the plea proceedings. Likewise, we find the testimony of lay witness, Mr. Elliot, was limited to opinions or inferences which were rationally based on his perception of Petitioner and the attending circumstances at the time of the plea hearing, helpful to a clear understanding of Mr. Elliot's testimony and to the determination of a fact in issue. *See Allen v. State*, 871 P.2d 79, 95 (Okl.Cr.), *cert. denied*, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994); 12 O.S.1991, § 2701. This supplemental claim is denied.

¶ 20  Fourth, Petitioner claims prosecutorial misconduct deprived him of due process. Specifically, Petitioner asserts the prosecutor misstated the law regarding the jury's duty, feasibility, and equal protection, interjected a personal sense of justice, denigrated defense witnesses, and commented on Petitioner's indigence. We have reviewed and considered the instances cited by Petitioner and find no reversible error. This Court has long recognized that the right of argument contemplates a liberal freedom of speech, and that the range of discussion, illustration, and argumentation is wide. *See Harvell v. State*, 395 P.2d 331, 339 (Okl.Cr. 1964), *overruled on other grounds, Buis v. State*, 792 P.2d 427 (Okl.Cr.1990). This supplemental claim of error is denied.

¶ 21  In his last supplemental claim of error, Petitioner contends the trial court abused its discretion in invoking the rule of sequestration prohibiting his experts from remaining in the courtroom. This is a case of first impression for this Court. The Oklahoma Supreme Court in *Clark v. Continental Tank Co.*, 744 P.2d 949 (Okl.1987), provides a historical background as well as an analysis of the rule of sequestration, as commonly known in the law, or the rule of exclusion of witnesses, as provided by statute, 12 O.S.Supp.1993, § 2615. The first statute providing for the exclusion of witnesses was enacted in 1978 and provided for the exclusion of witnesses either at the request of a party or on the trial court's own motion. The rule did not authorize exclusion of 1) a party who is a natural person or 2) an officer or employee of a party who is not a natural person designated as its representative by its attorney. In 1991, the Legislature amended the statute to forbid the exclusion of a person whose presence is shown by a party to be essential to the presentation of the party's cause.

¶ 22  Petitioner contends the presence of his experts was essential to his cause and claims because his attorney was not a psychiatrist or a psychologist, it was necessary to have his experts present during the State's case for the purpose of assisting his counsel in observing, understanding, and detecting the flaws in the testimony of the State's expert. Petitioner thus asserts that the trial court's invocation of the rule deprived him of a rebuttal which so infected the trial with unfairness that he was denied constitutional due process. Our review of the record reveals that while Petitioner's counsel noted his objection and exception to the trial court's

ruling, he made no showing that his expert's presence was essential to the presentation of Petitioner's cause. Based on counsel's failure to make the requisite showing, we find the trial court did not abuse its discretion in invoking the rule to exclude Petitioner's expert witnesses. This supplemental proposition of error is denied. Having denied all of Petitioner's supplemental claims, we find that Petitioner's due process rights were not violated by these competency proceedings. Accordingly, this proposition is denied.

¶ 23   In his fifth proposition of error, Petitioner claims he was denied effective assistance of counsel because his counsel utterly abdicated his role as representative and advocate of Petitioner's interests in pursuit of orchestrating a guilty plea. Petitioner also claims that trial counsel not only failed to recommend a sentence of less than death, but called the victim's mother to testify and elicited from her the opinion that Petitioner should receive the death penalty. Petitioner argues that trial counsel's choices cannot be considered strategic in the face of trial counsel's reckless disregard for Petitioner's interests.

¶ 24   In the hearing on the application to withdraw Petitioner's plea, trial counsel explained his basis for recommending to Petitioner that he enter a plea of guilty. In summary, he stated that he thought the best defense they had at trial "was just to create a reasonable doubt that Barney had done it, and that at most he had confessed to a crime, or series of crimes when he was intoxicated and not able to appreciate what he was saying or doing." Trial counsel stated that he considered all the evidence, including the "very damaging aspect of the videotape, particularly, comments he made on the tape when, after being left alone," the fact that Petitioner's alibi witnesses did not pan out, and that Petitioner was unable to provide names and addresses of other witnesses.

¶ 25   Trial counsel visited the crime scene, filed a number of pre-trial motions, including one attacking the admissibility of Petitioner's videotaped confession. That motion was overruled. Trial counsel's motion for determination of competency was granted and Petitioner was found competent to stand trial. It was trial counsel's opinion that a jury was certain to convict Petitioner and to recommend the death sentence, and that Petitioner would have a better chance to avoid the death penalty by entering a blind plea of guilty.

¶ 26   Based on the foregoing and in light of our holding in Proposition I, we find trial counsel's assessment of this case was realistic and his strategic choice to recommend to Petitioner that he plea guilty was not unreasonable under the circumstances.[6] As we have long held, this Court will not second guess trial counsel's strategy. *See Goulsby v. State*, 742 P.2d 567, 572 (Okl.Cr. 1987) and *Johnson v. State*, 620 P.2d 1311, 1313 (Okl.Cr.1980). This proposition is denied.

¶ 27   In his sixth assignment of error, Petitioner asks this Court to vacate his death sentence because the State failed to comply with 21 O.S.1981, § 701.13 by not providing adequate notice of the evidence which would be used against him during sentencing. Six days before trial, the State filed a "More Definite and Certain Statement of Allegations Set Forth in the Bill of Particulars in Rem Punishment," which set forth each of the three aggravating circumstances followed by:

The State will present evidence by incorporating all of the testimony and exhibits presented in the guilt stage of this trial, CF–90–3512.

On the day of trial, just before the entry of the guilty pleas, defense counsel demurred to the Bill of Particulars. Said motion was overruled. Petitioner relies on *Wilson v. State*, 756 P.2d 1240, 1244 (Okl.Cr.1988),

---

6.  At the hearing on the application to withdraw his plea, Petitioner's family minister testified that he was with the family on the day of trial and was privy to the discussions concerning whether to go to trial or to plead. He testified that the family wanted Petitioner to go to trial, while trial counsel and his associate counsel who was initially sought by the family to represent Petitioner, urged Petitioner to plea because he would have a much better chance of receiving life or life without parole.

where we held "[t]he issue is not what evidence is available but which of the available evidence a defendant would have to defend against." Additionally, we held it was reversible error not to provide a precis [7] of the evidence that would be presented through the witnesses who would be called. Pursuant to 21 O.S.1981, § 701.10, "[o]nly such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible" during second stage proceedings. In *Boyd v. State*, 839 P.2d 1363, 1368 (Okl.Cr.1992), *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993), we held the purpose of this pretrial notice is "to apprise the defendant of evidence relevant to sentencing which will be introduced for the first time in the sentencing hearing."

¶ 28  The record reveals that Petitioner's sentencing proceeding was held on April 5, 1991, more than two months after his plea. The State made an opening statement setting out each aggravating circumstance, the witness it intended to call and a summary of what that witness' testimony would be. Trial counsel voiced no objection. When asked by the trial judge whether he would like to make an opening statement, trial counsel responded by waiving opening statement and informing the court that by previous agreement of counsel, he would call his witness first because of scheduling problems. We thus find that Petitioner waived his right under § 701.10. "[F]ailure to object to lack of notice, either at a pre-trial hearing or at the time the challenged evidence is offered, will result in waiver of this statutory right." *Green v. State*, 713 P.2d 1032, 1038 (Okl.Cr. 1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), *overruled on other grounds* by *Brewer v. State*, 718 P.2d 354, 366, n. 1 (Okl.Cr.1986). *See also Hayes v. State*, 845 P.2d 890, 893 (Okl.Cr.1992) (issue not properly preserved for review).

¶ 29  In his seventh proposition of error, Petitioner claims that the evidence was insufficient to prove that the homicide was especially heinous, atrocious or cruel. He asserts that there was no evidence to show

that the victim suffered "sustained conscious suffering." Relying on *Crawford v. State*, 840 P.2d 627, 641 (Okl.Cr.1992), Petitioner argues that the physical suffering did not go beyond the pain inherent in asphyxiation where unconsciousness occurs within a minute. We do not agree. Petitioner's confession provides the necessary evidence which reveals that Petitioner held the victim, choking and struggling, under water. He pulled her up, and when she continued to cough, he held her under again until she quit. This proposition of error is denied.

¶ 30  In Proposition VIII, Petitioner challenges the constitutionality of the continuing threat aggravator and the propriety of its application in this case. He asks this Court to reconsider its position holding this aggravator to be specific, not vague, and readily understandable without further definition. This Court has often held that the facts of the crime itself and a defendant's lack of remorse will support the continuing threat aggravating circumstance. *See Sellers v. State*, 809 P.2d 676, 690, (Okl.Cr.), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Fisher v. State*, 736 P.2d 1003, 1009 (Okl.Cr.1987), *rehearing denied*, 739 P.2d 523 (Okl.Cr.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *VanWoundenberg v. State*, 720 P.2d 328, 336–337, (Okl.Cr.), *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Additionally, we have determined that there is no doubling of aggravating circumstances where the aggravating factors do not refer to the same aspect of the defendant's crime. *Cf. Woodruff v. State*, 846 P.2d 1124, 1145–46 (Okl.Cr.), *cert. denied* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); *Green*, 713 P.2d at 1039–41. This proposition is without merit.

¶ 31  Finally, Petitioner asserts that the trial court's finding that the mitigating evidence did not outweigh the aggravating circumstances was clearly erroneous and resulted from the State's denigration of his mitigating circumstances by characterizing them as minimal and as amounting only to

---

7. In *Wilson*, 756 P.2d at 1245, footnote 1, this Court adopted the definition of precis: "a concise summary of essential points, statements, or facts; summary: covering the main points succinctly; ..." (citation omitted).

excuses. Petitioner complains that the trial court's conclusion that the mitigating circumstances lacked any element of remorse [8] is not supported by the evidence. Further, the statement he made during his interrogation does not show lack of remorse but a "resigned expression and false bravado of a man who has just realized that he was duped into telling police that he had committed a murder that he, from that point on, adamantly denied." Petitioner claims the trial court did not consider Dr. Altshuler's opinion regarding cultural factors.[9] Petitioner claims that the trial court considered the pre-sentence investigation report in violation of *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) and *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988).

¶ 32  The record does not show that the trial court used the presentence investigation report in the sentencing proceeding. The record is clear as to the factors the trial court used in making its decision to impose the death penalty. The decision maker in this case was a judge, not a jury, and unless proven otherwise, we will presume the decisions made with respect to sentencing were in compliance with the law and without passion or prejudice. We find no error.

### Mandatory Sentence Review

■ ¶ 33  Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1991, § 701.12. We shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

¶ 34  The trial court found the following aggravators:

1. The murder was especially heinous, atrocious or cruel; and

2. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

In reviewing the evidence presented by the State, we find that the murder was especially heinous, atrocious, or cruel, in that Petitioner held the victim, choking and struggling, under water. He pulled her up, and when she continued to cough, he held her under again until she quit. We further find that the callous nature of the crime, and Petitioner's blatant disregard for the importance of human life, render him a continuing threat to society. The evidence substantially supports the finding of the two aggravators.

■ ¶ 35  The following mitigating circumstances were considered:

1. Petitioner came from an unstable domestic environment early in his life, his father was an alcoholic and abusive to him and his mother.

2. Petitioner felt abandoned and rejected by his mother which was reinforced by early enrollment in boarding school.

3. Petitioner abused alcohol since he was eighteen years of age.

4. Petitioner was under the influence of alcohol at the time of the murder.

5. Petitioner was twenty-one years of age at the time of the murder.

6. Petitioner had no significant history of prior criminal activity.

7. Petitioner had learning disabilities, leading to a cycle of socio-educational maladjustment.

8. Native Americans tend to be emotionally constricted, and there may be some cultural impact on Petitioner in this regard.

9. Petitioner is limited in his ability to think and verbalize his feelings.

---

8.  At the formal sentencing, Petitioner responded to defense counsel and the trial judge that he was sorry for what happened to Helen.

9.  According to Dr. Altshuler, "Native Americans tend to be emotionally constricted and they do not verbalize their feelings, and oftentimes not very much of their, their (sic) personal thinking. And therefore, it would be very difficult to determine how truly remorseful Barney was, unless a person had spent a fairly good period of time getting to know him."

¶ 36 Upon carefully considering and reviewing the evidence which supports the aggravating circumstances, as well as the evidence which may be considered mitigating, this Court finds the sentence of death was factually substantiated and appropriate. Furthermore, we find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. Finding no error warranting reversal or modification, the Judgments and Sentences are **AFFIRMED.**

STRUBHAR, V.P.J., and LANE, J., concur.

LUMPKIN, J., specially concurs.

CHAPEL, P.J., concurs in results.

LUMPKIN, Judge, specially concurring:

¶ 1 I concur in the decision to affirm the conviction and death sentence. However, I write separately to address the following issues.

¶ 2 Petitioner's first allegation of error, that his confessions were obtained in violation of his constitutional right to remain silent, was not raised in his motion to withdraw guilty plea. An issue may not be raised in the petition for a writ of certiorari unless the same has been raised in the application to withdraw the plea. Rule 4.2(B), *Rules of the Oklahoma Court of Criminal Appeals,* Ch. 18, App. (1998). (This same requirement was set out in Rule 4.1(A) in 1992 when the motion was filed.) Therefore, this issue is not properly before the Court.

¶ 3 Further, any error in admitting Petitioner's confessions was waived by the plea of guilty. *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969), *superseded on other grounds by statute,* Fed.R.Crim.P. 11(H) (entering a knowing and voluntary guilty plea waives several constitutional rights, including the right against compulsory self-incrimination); *Corn v. State of Oklahoma,* 394 F.2d 478 (10th Cir.), *cert. denied,* 393 U.S. 917, 89 S.Ct. 245, 21 L.Ed.2d 203 (1968) (a voluntary guilty plea waives all nonjurisdictional defects in proceedings preliminary thereto). There-fore, it is not necessary that we address the issue on its merits.

¶ 4 The format of the opinion also skews the nature of the review in this case. As noted previously, Rule 4.2(B) provides "[n]o matter may be raised in the petition for a writ of certiorari unless the same has been raised in the application to withdraw the plea, ..." In addition, this Court must conduct a mandatory sentence review in capital cases. *See Grasso v. State,* 857 P.2d 802, 808 (Okl.Cr.1993); *Wallace v. State,* 893 P.2d 504 (Okl.Cr.1995). The application to withdraw the plea of guilty set out the basis for the plea withdrawal:

1. The guilty pleas were entered without the adequate advice of counsel concerning, and through Defendant's inadvertence and ignorance of, the nature and legal consequences of the charges against him.

2. The guilty pleas were entered without the adequate advise of counsel concerning, and through Defendant's inadvertence and ignorance of, the nature and legal consequences of the factual evidence against him.

3. The Defendant was influenced to enter his pleas of guilty and did so on the basis of material misunderstandings.

4. The Defendant's pleas of guilty were made in undue haste, without sufficient time to deliberate on the nature and consequences of those pleas and without a full understanding of the factual evidence against him.

5. Defendant's pleas were not entered freely, voluntarily, knowingly and intelligently.

6. There was an insufficient factual basis to support convictions on the charges to which Defendant pled guilty.

7. The Defendant was never informed of information which would have supported defenses to the charges to which he pled guilty.

8. The Defendant had valid defenses to the charges against him and those defenses should have been presented to a jury.

9. The Defendant was not competent to waive his constitutional rights and enter his pleas of guilty in a knowing and intelli-

gent manner due to mental, neurological, chemical, or intellectual impairment.

10. The Defendant was deprived of the effective assistance of counsel.

¶ 5 The review of the denial of the application to withdraw the plea by the District Court is limited because when a defendant enters a guilty plea then seeks to withdraw that plea, the only concern is whether the plea was knowingly and voluntarily entered. *Frederick v. State*, 811 P.2d 601, 603 (Okl.Cr. 1991). In addition, when evaluating the validity of a guilty plea, we are concerned only with whether or not the plea was entered voluntarily and intelligently. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). In *Ocampo v. State*, 778 P.2d 920 (Okl.Cr.1989), we held the requirements set forth in *King v. State*, 553 P.2d 529 (Okl.Cr.1976), are to be used as a guideline "in establishing the totality of the circumstances surrounding the guilty plea which will provide a proper record to determine its validity." *Ocampo*, 778 P.2d at 923. The voluntariness of the plea is to be determined by examining the entire record. *Berget v. State*, 824 P.2d 364, 372 (Okl.Cr.1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). When a defendant claims that his guilty plea was entered through inadvertence, ignorance, influence or without deliberation, he has the burden of showing that the plea was entered as a result of one of these reasons and that there is a defense that should be presented to the jury. *Estell v. State*, 766 P.2d 1380, 1383 (Okl.Cr.1988).

¶ 6 Reviewing the District Court's decision within the context of the limitations of Certiorari review set out above, together with the mandatory sentence review set out in *Grasso* and *Wallace*, I concur in the results reached by the Court in this case.