2000 OK CR 7

**Richard Eugene HAMMON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–97–910.

Court of Criminal Appeals of Oklahoma.

March 28, 2000.

Rehearing Denied June 5, 2000.

Thomas C. Giulioli, District Attorney Okmulgee County, Norman Thygeson, Assistant District Attorney. Okmulgee, Attorneys for the State at Trial.

James C. Bowen, Oklahoma Indigent Defense System Tulsa Capital Trial Division, Tulsa, Attorney for Defendant at Trial.

Julie L. Gardner, Appellate Defense Counsel, Capital Direct Appeals Div. Oklahoma Indigent Defense System, Norman, Attorney for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General Oklahoma City, Attorneys for Appellee on Appeal.

LILE, Judge:

## OPINION

¶ 1 In 1991 Richard Eugene Hammon, Appellant, was tried by jury in the District Court of Okmulgee County, Case No. CRF–90–144, before the Honorable Anne Moroney, District Judge. Hammon was convicted of Murder in the First Degree (21 O.S.Supp. 1989, § 701.7(B)) (Felony–Murder) and was sentenced to death. The conviction was affirmed on appeal, however the case was reversed and remanded for re-sentencing. *See Hammon v. State,* 1995 OK CR 33, ¶¶ 2–8, 898 P.2d 1287, 1310.[1]

¶ 2 The Honorable Charles S. Woodson, District Judge, conducted the re-sentencing trial in 1997. The jury set punishment at death after finding four aggravating circumstances:

1) The defendant was previously convicted of a felony involving the use or threat of violence to the person;

2) The defendant knowingly created a great risk of death to more than one person;

3) The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;

4) The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

¶ 3 The court imposed the death sentence in accordance with the verdict. Hammon is before this Court on original appeal of his re-sentencing trial.

---

1. Hammon's co-defendant, Benny Dwight Jones, was tried jointly with Hammon and also received the death penalty for the murder. Jones appealed separately, and his death penalty was also set aside and his murder case remanded for a new sentencing trial. *Jones v. State,* 1995 OK CR 34, 899 P.2d 635, 640. Jones was re-sentenced to death at his second sentencing trial. That trial has been reversed and remanded for a third sentencing trial. *Jones v. State,* 1999 OK CR 8, ¶ 9, 990 P.2d 247, 70 OBJ 659.

## FACTS

¶ 4 Appellant Richard Hammon, 21, and his friend Benny Jones, 18, left Okmulgee, driving toward Muskogee early on Thursday, June 28, 1990. Jones was driving an Oldsmobile Cutlass he had just stolen. They headed for Muskogee, each carrying a loaded .22 revolver. Hammon had fired his weapon a few days earlier and knew that it worked.

¶ 5 About 5:30 a.m. they entered Bud's Convenience Store in Muskogee to rob it. Hammon went to the restroom, and when he came back out said, "No witnesses." Then he pulled his gun and pointed it at the only customer in the store, Charles Reeves, and demanded his money. Reeves gave him his billfold. Meanwhile Jones was robbing the clerk, Richard Dix, and then shot him in the groin with his .22 revolver. Jones and Hammon together stripped Mr. Reeves' billfold and threw it in a trash can. Then Jones went back and shot Mr. Reeves. Both Mr. Dix and Mr. Reeves survived.

¶ 6 Jones then stole a white Firebird, and they drove back to Okmulgee. Hammon said they laid down at the apartment for a while, but Jones kept saying "Let's do one more, let's do one more." They followed a Schwan's delivery truck on its route for some time. The driver of the Schwan's truck, David Stewart, reported this to the police. He was able to see the passenger, and later identified him as Hammon. He also wrote down the Arkansas tag number from the white Firebird. Hammon and Jones stopped at a Sonic drive-in, which was near Truck 'N Things, an automotive accessory and parts store in Okmulgee, Oklahoma, owned by Eugene Slape, and from there planned the robbery of Truck 'N Things.

¶ 7 Around 11:00 a.m., Hammon and Jones entered Truck 'N Things with their guns concealed. They looked around while waiting for a customer to leave. Hammon looked for a surveillance camera and when he was sure there was no camera, he nodded to Jones to commence the robbery. Jones approached Eugene Slape at the front counter, seemingly to purchase merchandise. As Mr. Slape rang up the sale and the cash register drawer opened, Jones pulled out his gun and demanded the money. Jones claimed Mr. Slape appeared to be reaching for a gun, so he shot him three times. Mr. Slape fell to the floor near the cash register.

¶ 8 Bradley Slape, Eugene Slape's son, was in the back, tinting the window on the left door of a Dodge pickup. Bradley's wife normally worked there also, in the family business. She had been there earlier that morning with their baby, but she and the baby had left with Bradley's mother to go to Tulsa.

¶ 9 Bradley couldn't see the cash register area from where he was working. He heard some loud footsteps, then a popping noise. He thought maybe someone had dropped something. He heard some groaning, and then two more shots (although he didn't realize at that moment that they were gunshots) right after each other, "as fast as you could pull a trigger." He heard the two shots then heard his dad yell out real, real loud, "No!—screamed it like he was in fear of something."

¶ 10 Immediately after Jones shot Eugene Slape the third time, Hammon opened a door and ran to the back room where he found Bradley. He ran towards Bradley screaming. Bradley couldn't understand what he was saying at first. Bradley was standing between the open truck door and the truck. As Hammon approached Bradley, Hammon pointed a gun directly in his face, about two feet from his head. Bradley finally realized what Hammon had been saying. Hammon screamed again: "I said this is a fucking holdup." Bradley realized that he knew Hammon from school, but couldn't remember his name.

¶ 11 Bradley jumped in the pickup seat and begged Hammon not to shoot. Hammon began to run from the room. Bradley raised his head to see where Hammon was, and Hammon stopped running and again pointed his gun at Bradley's head. Bradley ducked down again, and immediately he heard Hammon fire the gun. Bradley could not see in which direction Hammon fired the gun. Hammon ran out through the front, but took time to stop at the cash register, next to where Eugene Slape lay on the floor, to grab some chrome wheel spinners and some car speakers that Jones had left there.

¶ 12 Within thirty seconds to a minute, Bradley heard the sound of the front door closing, went to the front to check on his father, and found him lying on the floor near the open cash register staring at the ceiling and unable to breathe, like he was holding a big breath of air. Bradley was pushing him and patting his face and screaming, "Tell me what to do, dad, tell me what to do!" Bradley contacted the police and tried to assist his father. Then his dad let out his last breath of air, and blood gushed from his mouth and formed a pool on the floor. The police arrived shortly thereafter and resuscitation measures were attempted, but were unsuccessful.

¶ 13 Bradley told Detective Travis Tolar that he knew the man who ran into the back room and pointed a gun at his head. He advised he did not know his name, but could identify him from a high school yearbook. Detective Tolar obtained an Okmulgee High School yearbook, and Bradley identified Hammon as the man who pointed a gun at his head. Police searched for a .22 projectile but were not able to find one. There was testimony that bullets sometimes fragment when they hit cement. It was necessary to read Bradley Slape's testimony from a transcript of the original trial because he had committed suicide before the resentencing trial.

¶ 14 Hammon and Jones continued riding in the stolen white Firebird until they ran out of gas. They were seen laughing, and an acquaintance saw Jones make a gesture with his forefinger and thumb like a gun pointing.

¶ 15 As Detective Tolar was leaving Truck 'N Things, he received a tip from an informant that Hammon was "staying at the Projects." Detective Tolar and several other officers proceeded to apartment 603–A in the "Projects." Detective Tolar knocked on the door of 603–A, where he found Hammon and Jones and took them into custody.

¶ 16 After obtaining consent to search from Cassandra Jones, the police found merchandise from Truck 'N Things in the apartment. They also found $59.00 hidden under a mattress and $75.00 in a purse. Jackie Alexander, also present during the search, testified that when Hammon and Jones arrived at the apartment at 11:30 a.m., they were carrying a box and some car spinners. Shortly after arriving, Hammon asked Alexander to take his black bag containing two guns to her "mama's house." Instead, she took the bag to her friend Charlotte Beard's apartment and hid it in a closet. Charlotte Beard consented to a search of her apartment where the police seized the black bag containing two .22 caliber weapons, the CDM revolver with six live rounds, and the Ivers Johnson revolver with three live rounds and three spent rounds.

¶ 17 Both Hammon and Jones admitted to OSBI Agent David Page that they had jointly participated in the robbery of Truck 'N Things.

¶ 18 In Hammon's statement he admitted planning to rob Truck 'N Things. He claimed he went to the back of the store where an employee was working on a pickup, pointed his gun at the employee, and ordered him into the pickup. He returned to the front of the store and grabbed a box of car speakers and some car spinners.

¶ 19 Both defendants admitted they had been involved a few hours earlier in the early morning robbery and shooting incident in Muskogee. Hammon admitted carrying and pointing a loaded .22 revolver at and robbing the customer in Muskogee, and admitted pointing the loaded .22 revolver at Bradley Slape during the Okmulgee robbery. However, he denied shooting at Bradley, or otherwise discharging the firearm in the premises. Hammon claims he did not shoot the gun during either robbery, did not intend to shoot anybody, and did not know Jones was going to shoot anybody. Hammon admitted, however, that he knew prior to the Slape shooting that Jones had already shot two people in the Muskogee robbery.

## 1.

### ENMUND/TISON THRESHOLD FOR DEATH SENTENCE ELIGIBILITY

¶ 20 In Proposition I, Hammon argues that *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 149–150, 107

S.Ct. 1676, 1684, 95 L.Ed.2d 127 (1987) were not followed in his re-sentencing trial.

▄ ¶ 21 *Tison* establishes the least culpable mental state sufficient for death sentence eligibility as "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death." *Tison*, 481 U.S. at 157, 107 S.Ct. at 1688, 95 L.Ed.2d at 145. We note that no *Enmund/Tison* instruction was requested by Hammon at trial.

¶ 22 *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) (overruled in part on other grounds by *Pope v. Illinois,* 481 U.S. 497, 503 n. 7, 107 S.Ct. 1918, 1922 n. 7, 95 L.Ed.2d 439, 447 n. 7 (1987)), stated that this is not a matter which must be determined by a jury. It is left up to each state to decide how the *Enmund* determination will be made.

¶ 23 It was also held in *Bullock:*

"The proceeding that the state courts must provide Bullock need not take the form of a new sentencing hearing before a jury. As indicated above, the Eighth Amendment does not require that a jury make the findings required by *Enmund.* Moreover, the sentence currently in force may stand provided only that the requisite findings are made in an adequate proceeding before some appropriate tribunal—be it an appellate court, a trial judge, or a jury. A new hearing devoted to the identification and weighing of aggravating and mitigating factors is thus, as far as we are concerned, unnecessary." *Id.* 474 U.S. at 392, 106 S.Ct. at 700, 88 L.Ed.2d at 720.

▄ ¶ 24 Hammon was not entitled to an *Enmund/Tison* instruction since the evidence presented was uncontradicted that Hammon (1) personally participated in the planning of the underlying felony; (2) was personally present at the robbery; (3) carried a fully loaded firearm into the robbery; (4) was the leader of the robbery in that Hammon, in accordance with the pre-agreed plan, searched for a surveillance camera, then signaled Jones to go ahead with the robbery; (5) knew that Jones also carried a loaded firearm; and (6) knew that in the joint robberies he and Jones had already committed

that day, Jones had shot two victims. It is clear that Hammon was a major participant in the underlying felony and that he acted with reckless indifference to human life. Robbery with a Firearm is a serious felony carrying a penalty of up to life imprisonment because it is imminently dangerous to human life.

¶ 25 *Enmund/Tison* requirements are not required to be proven as elements of the crime charged, but are a threshold requirement which must be shown in order for the death penalty to be upheld in an individual case. Having reviewed the evidence presented at trial, we have determined that the *Enmund/ Tison* threshold requirement has been met in this case to authorize the imposition of the death penalty. Hammon's first proposition of error is therefore denied.

## 2.
## VICTIM IMPACT EVIDENCE

▄ ¶ 26 Hammon in his second proposition maintains that the trial court committed several errors with regard to the admission of victim impact statements. He claims they were irrelevant and unduly prejudicial. He claims that the evidence went beyond the statutory limitations and the guidelines established by this Court in *Cargle v. State,* 1995 OK CR 77, 909 P.2d 806, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). He contends the victim's family made improper statements about the defendant. The statements, however, were clearly the victim's interpretation of the "circumstances surrounding the crime" and "the manner in which the crime was perpetrated." 22 O.S.Supp.1993, § 984; *Hain v. State,* 1996 OK CR 26, ¶ 49, 919 P.2d 1130, 1144, *cert. denied,* 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

▄ ¶ 27 Hammon also contends the victims improperly commented on the appearance of Mr. Slape after his death. Ms. Boss testified she stayed with her father from the time the funeral home opened until it closed. Such comments clearly revealed how family members were psychologically impacted by the murder. No error occurred in admitting such statements.

¶ 28 Hammon contends the comments about Bradley Slape and his suicide were improper. Family members testified he never recovered from his dad's murder and consequently took his own life. The comments were clearly offered to prove the emotional, psychological, and physical impact of the death on Bradley Slape, as well as the impact of his suicide upon the surviving family members. In addition, the jury had already heard from Bradley's transcript about the tremendous effect Eugene Slape's death had had on Bradley.

¶ 29 Hammon also contends the statements contained impermissible hearsay concerning Bradley Slape. The statements were not admitted to prove the truth of the matter asserted in the statements but to prove the impact on the family members, and were therefore admissible. 12 O.S.1991, § 2801; *Johnson v. State*, 1995 OK CR 62, ¶ 23, 911 P.2d 918, 925, *cert. denied*, 519 U.S. 839, 117 S.Ct. 116, 136 L.Ed.2d 67 (1996).

¶ 30 Hammon complains that the recommendation of a death sentence by the family members was improper. These, however, were short concise recommendations and were not improper. 22 O.S.Supp.1993, § 984.1. *See Turrentine v. State*, 1998 OK CR 33, ¶¶ 98–99, 965 P.2d 955, 981, *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562 (1998).

¶ 31 We find that the statements by the wife and daughters of Mr. Slape did not exceed a "quick" glimpse of the victim and the effect of his death on his survivors. *Cargle*, 1995 OK CR 77, ¶ 75, 909 P.2d at 828 (citing *Payne v. Tennessee*, 501 U.S. 808, 830, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720, 739 (1991) (O'Connor, J., concurring opinion with whom White and Kennedy, JJ., join)). The impact evidence comprises a mere twelve pages of transcript out of a total of 949 pages of transcript for the re-sentencing trial as a whole. The impact evidence was not excessive, and no error occurred.

¶ 32 Hammon complains that the reading to the jury by a family member of a couple of the impact statements which had been written by other family members violated the Confrontation Clause. Hammon did not object and has waived all but plain error.

Pursuant to 22 O.S.Supp.1993, § 984.1, a victim's family member may present an impact statement through testimony or through a written statement. *See Charm v. State*, 1996 OK CR 40, ¶ 34, 924 P.2d 754, 765, *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). Thus we find no plain error here.

¶ 33 Hammon says there was error in the trial because no determination was made by the trial court on whether evidence of one of the aggravating circumstances was already present before admitting the victim impact evidence. *Cargle*, 1995 OK CR 77, 909 P.2d at 828. Hammon was provided with copies of the impact statements over nine months in advance of trial. An in-camera hearing was conducted during the trial concerning the victim impact evidence, and Hammon was successful in having portions redacted. Although the trial court failed to make a finding on the record that evidence of one or more aggravating circumstances was already present in the record before admitting victim impact evidence, we find that in this case such evidence had in fact been presented regarding four separate aggravating circumstances, and in view of the overwhelming evidence of those circumstances, we find the error was harmless beyond a reasonable doubt.

¶ 34 Finally, Hammon contends that victim impact evidence "functions as an irrelevant, improper, non-statutory 'superaggravator' that will always be present in every capital case," and urges us to vacate his death sentence. We find that victim impact evidence is relevant and proper, as well as statutory. We have consistently held that victim impact evidence does not act as a "superaggravator." *See Douglas v. State*, 1997 OK CR 79, ¶ 82, 951 P.2d 651, 675, *cert. denied*, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998); *Cargle*, 1995 OK CR 77, ¶¶ 69, 75 n. 15, 909 P.2d at 826, 828 n. 15. This proposition is without merit.

### 3.
### AGGRAVATING CIRCUMSTANCE— MURDER TO AVOID ARREST OR PROSECUTION

¶ 35 Hammon claims in Proposition Three there is insufficient evidence to prove

that he intended to kill in order to avoid arrest or prosecution. We find that this aggravating circumstance was supported by the evidence. The predicate crime was the armed robbery of Truck 'N Things. Hammon looked for a surveillance camera before signaling Jones to begin the robbery. Neither robber wore a disguise. Jones shot Eugene Slape quickly after the cash register was opened. Although the Muskogee crimes were not the predicate for the "avoid arrest or prosecution" aggravator in this case, they are highly probative of Hammon's intent to avoid arrest or prosecution. Charles Reeves quoted Hammon as saying during the Muskogee robbery: "No witnesses."

¶ 36 It is true that Bradley Slape was spared, but since Hammon told him to get down in the truck, Hammon may have believed that Bradley would not get a good look at him.

¶ 37 There was competent evidence to support the "avoid arrest or prosecution" aggravator, and we deny this third proposition of error. *Pennington v. State*, 1995 OK CR 79, ¶ 63, 913 P.2d 1356, 1370–71, *cert. denied*, 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996).

### 4.

### AGGRAVATING CIRCUMSTANCE— GREAT RISK OF DEATH TO MORE THAN ONE PERSON

¶ 38 Hammon claims in Proposition Four there was insufficient evidence to prove the aggravating circumstance of great risk of death to more than one person and further that this aggravator is unconstitutionally vague. Hammon pointed a firearm twice at Bradley Slape and screamed profanity at him while, at one point, the gun was two feet from Bradley's forehead. When Bradley raised up in the pick-up to see out, Hammon pointed the gun at him again, and immediately after that, fired the gun, according to Bradley's testimony. *Wood v. State*, 1998 OK CR 19, ¶ 50, 959 P.2d 1, 13; *Ross v. State*, 1986 OK CR 49, ¶ 23, 717 P.2d 117, 123, *affirmed, Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

¶ 39 Further, this aggravator is not unconstitutionally vague. *Malone v. State*, 1994 OK CR 43, ¶¶ 30–32, 876 P.2d 707, 716. Hammon's fourth proposition is without merit.

### 5.

### AGGRAVATING CIRCUMSTANCE— PRIOR VIOLENT FELONY CONVICTIONS

¶ 40 Hammon claims the two Muskogee convictions for Robbery with a Firearm, and two convictions for Shooting with Intent to Kill (which resulted from the Muskogee robberies that morning) were not *prior* violent felonies. However, we have held that a prior violent felony may include any convictions prior to the sentencing date of the present crime. *McCarty v. State*, 1999 OK CR 18, ¶ 5, 977 P.2d 1116, 1141 (Order Denying Petition for Rehearing); *Miller v. State*, 1998 OK CR 59, ¶ 55, 977 P.2d 1099, 1111, *cert. denied*, —— U.S. ——, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999); *Grasso v. State*, 1993 OK CR 33, ¶¶ 24–25 & n. 4, 857 P.2d 802, 808–09 & n. 4. Hammon's prior conviction for Assault and Battery with a Dangerous Weapon in Okmulgee County in 1989 was also properly admitted.

### 6.

### COURT REFUSED TO EXCUSE A JUROR FOR CAUSE

¶ 41 Hammon complains that Juror Lawley should have been excused for cause. She said she would have difficulty giving a life sentence. But she also said it would be just as hard for her to consider the death penalty. She said she would listen but would really have to study it hard. The trial court did not abuse its discretion in refusing to excuse the juror for cause. *Cannon v. State*, 1995 OK CR 45, ¶¶ 12–14, 904 P.2d 89, 97–98, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996); *Smith v. State*, 1996 OK CR 50, ¶ 13, 932 P.2d 521, 528, *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997).

### 7.
### COURT EXCLUDED TESTIMONY OF MITIGATION WITNESS FOR VIOLATION OF THE RULE

 ¶ 42 In Hammon's Proposition Seven, he complains that his sister, Sharon Walston, was excluded from testifying for the defense because she had violated the rule of sequestration of witnesses. Defense counsel did not make an offer of proof as to what her testimony would be. Error may not be predicated upon a ruling which excludes evidence unless the substance of the evidence was made known to the judge by offer, or was apparent from the context within which the questions were asked. 12 O.S.1991, § 2104(A)(2). *Hill v. State,* 1983 OK CR 161, ¶ 20, 672 P.2d 308, 311–12. Defense counsel originally requested the rule of sequestration. Now on appeal, Hammon submits a supporting affidavit saying Sharon Walston was prepared to testify in mitigation as to Hammon's character and his childhood and development. Several other witnesses were available and testified about such matters. Her testimony would have been cumulative at most. Hammon has not shown prejudice from the proper enforcement of the rule. *Rogers v. State,* 1978 OK CR 86, ¶ 14, 583 P.2d 1104, 1107; *Marshall v. State,* 1998 OK CR 30, ¶ 22, 963 P.2d 1, 8–9, *cert. denied,* 525 U.S. 1125, 119 S.Ct. 910, 142 L.Ed.2d 908 (1998).

### 8.
### TESTIMONY OF DAVID MEEKS CONCERNING JAIL INVESTIGATIVE REPORTS

 ¶ 43 In Proposition Eight Hammon complains that David Meeks, the Security Director of the Muskogee County Jail, was called to testify about two incidents involving misconduct by Hammon while he was incarcerated there. Meeks failed to bring the actual jail records, but testified from notes he had prepared from the records. Defense counsel strenuously objected to his testimony about two investigative reports concerning the infractions. Investigative reports by law enforcement personnel are not included in the public records exception to the hearsay rule. *Humphreys v. State,* 1997 OK CR 59, ¶ 25, 947 P.2d 565, 574–575, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); 12 O.S.1991, § 2803(8). Admission of this information through Meeks was error.

¶ 44 The admission of this testimony based on those records was harmless beyond a reasonable doubt, however, in light of the additional overwhelming evidence supporting the aggravating circumstance of "continuing threat." *Id.* We therefore find that the improper admission of the Muskogee jail investigative reports was harmless error.

### 9.
### EVIDENCE OF EVENTS PRIOR TO THE MURDER

[21, 22] ¶ 45 Hammon maintains in Proposition Nine that evidence pertaining to his and Jones's activities on the morning of the murder should not have been admitted at the resentencing trial. Such evidence was proper to show the association of the defendants just before the crime. Hammon even objects to testimony of witnesses who saw the defendants entering Truck 'N Things together just before the robbery. The evidence was proper. Also, the method of introducing evidence by transcript from the previous trial was proper. *Salazar v. State,* 1998 OK CR 70, ¶ 15, 973 P.2d 315, 323; 21 O.S.Supp.1993, § 701.10a(4). *See also Humphreys,* 1997 OK CR 59, 947 P.2d at 573. Hammon's ninth proposition is denied.

### 10.
### COMPETENCY HEARING— BURDEN OF PROOF

 ¶ 46 The trial court granted the defense request for a psychological evaluation on January 8, 1991, and held a post-examination competency hearing at the request of the State on February 13, 1991. 22 O.S.1991, § 1175.4. Neither party requested that the post-examination competency hearing be conducted as a jury trial. In Proposition Ten, Hammon argues he was held to the unconstitutional standard of proving his lack of competency "by clear and convincing evidence." *See Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Hammon is correct when he asserts this unconsti-

tutional standard was in place at the time of his hearing, and we will assume it was applied to him. The proper standard of proof is a preponderance of the evidence: that more likely than not, Hammon lacked competence to stand trial. *Id.*

¶ 47 This Court has examined Hammon's Motion for Psychological Examination filed December 4, 1990, the transcript of the hearing on Hammon's motion conducted January 8, 1991, the transcript of the Post Examination Competency Hearing conducted February 13, 1991, and the orders, minutes, pleadings, and report of Eastern State Hospital filed in the case pertaining to his motion and hearing, including the court's order finding that Hammon was competent. (O.R.61, 65–66, 68, 71–72, 75–78, 80, 85, 88–89.) We note that there was no finding by the court that there was a "doubt" as to Hammon's present competency, nor was it even mentioned in the pleadings, nor was it mentioned in the hearings. Hammon was sent to Eastern State Hospital for examination by agreement of the parties. (Tr. Jan. 8, 1991, Hearing, p. 5.) His attorney indicated that his purpose in asking for a psychological examination was to determine if his client had a defense. (Tr. Feb. 13, 1991, Hearing, pp.15,16.)

¶ 48 Since there was never a judicial finding by the court that there was a doubt as to Hammon's present competency, no post examination competency hearing was required. As we said in *Robison v. State*, 818 P.2d 1250, 1252 (Okl.Cr.1991), *cert. denied*, 503 U.S. 915, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992):

"Our review of the record indicates that there was never a judicial finding pursuant to 22 O.S.1981, § 1175.1, et seq., that a doubt as to appellant's competency existed. Rather, it appears that appellant was allowed a psychiatric examination by agreement of the parties...."

■ ¶ 49 However, since in Hammon's case a post-examination competency hearing was nonetheless granted by the trial court, and since Hammon did not request a jury trial at that time and the hearing was conducted by the court without a jury, this Court will conduct a de novo review on competency using the proper standard of proof

established in *Cooper.* *See Ochoa v. State*, 1998 OK CR 41, ¶¶ 7–8, 963 P.2d 583, 590–91, *cert. denied*, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999), and *Smith*, 1996 OK CR 50, ¶ 11, 932 P.2d at 528. We said in *Smith*,

"The defense failed to prove, even by a preponderance of the evidence, that Appellant [Smith] was incompetent to stand trial. Because the evidence in this case so strongly supports the finding that [Smith] was competent, we need not remand this case for a new determination on this issue." *Id.*

■ ¶ 50 Evidence at the Post Examination Competency Hearing consisted of the testimony of the examining psychologist that Hammon was competent to stand trial as indicated in her report filed with the court and admitted into evidence. (Tr. Feb. 13, 1991, Hearing, p. 24, and State's Exhibit 1.) Forensic psychologist Dr. Jeanne Russell, Ed.D., reported that Hammon was able to appreciate the nature of the charges against him and was able to consult with his lawyer and rationally assist in the preparation of his defense. She reported that Hammon had serious doubts that his attorney was trying to help him and expressed frustration and a lack of confidence in the defense he was receiving. He believed hat hiring his own attorney would improve his chances in court. Dr. Russell found he was not mentally ill and that he did not demonstrate symptoms which would fall within the legal definition of mental illness. Hammon reported a history of seizures and had been treated with tegretol and dilantin, but this did not cause him to be incompetent. Dr. Russell testified at the hearing and was cross-examined by Hammon's attorney. Her testimony supporting Hammon's competency was uncontroverted, and Hammon presented no witnesses.

¶ 51 Applying the correct standard of proof, as established in *Cooper*, to Hammon's case, he did not carry his burden to prove incompetence, and we find that he was competent to stand trial. Therefore, his tenth proposition is denied.

## 11.
## TWO PROSPECTIVE JURORS WITH IMPAIRED HEARING EXCUSED BY THE COURT

■ ¶ 52 Hammon in Proposition Eleven complains that two jurors were excused from jury service because they had hearing problems. Mr. Brown approached the bench thinking his name had been called when it hadn't. He said, "I'm kind of hard of hearing. I can't hear that good." He also said, "I don't think I'm fit to be on a jury anyway." When the judge excused him he thanked the judge. Hammon did not object.

■ ¶ 53 Ms. McCart told the judge she was deaf in one ear, had a hearing aid in the other, and could not hear low tones. The judge asked her, "Do you think you want to try it or do you think it would be better for you to be excused?" She said, "It certainly would be better if I were excused." The judge excused her for the day and she thanked him. Hammon did not object. The court did not abuse its discretion when it excused the jurors at their request without objection. The decision to excuse a prospective juror for cause is within the discretion of the trial court, which will not be disturbed absent an abuse of discretion. *Douglas*, 1997 OK CR 79, ¶ 10, 951 P.2d at 660. Hammon's Proposition Eleven is denied.

## 12.
## PROSECUTOR'S COMMENTS

■ ¶ 54 Hammon in Proposition Twelve objects to certain comments made by the prosecutor at trial. The prosecutor asked Dr. Reynolds, "Did you ever go into anything concerning gang affiliation?" Hammon's counsel objected and the court sustained the objection. The prosecutor did not pursue the line of questioning. The prosecutor asked Ms. Oneal, Defendant's cousin, about her statement that some of Hammon's friends are not very good. He said, "Birds of a feather flock together." If this was a question, it was proper cross examination based on the preceding statement of the witness. Counsel should only ask questions and not make statements during cross examination. If it was a gratuitous comment by counsel, the error was cured when the court sustained an objection. *Thomas v. State*, 1991 OK CR 58, ¶ 16, 811 P.2d 1337, 1342–43. There was no request that the court admonish the jury to disregard the comment. Certainly this comment did not determine the verdict.

■ ¶ 55 He also asked Ms. Oneal about Hammon's grandmother. He said, "Its terrible to lose someone to death isn't it?" She said, "Yep." He said, "But she died from cancer didn't she?" There was no objection and no error. Hammon fails to cite any authority. The question was within the permissible range of cross examination.

■ ¶ 56 The prosecutor said: "There's a picture of Gene Slape lying on the floor in his business with people standing over him, kneeling over him and trying to work on him to save his life. He didn't get a chance to ask Ruthless Richard, would you spare my life?" The prosecutor was referring to a photographic exhibit in closing argument. "Ruthless Richard" was a term that Hammon used to describe himself. He identified the letter he had written to Shelia Clark from jail in 1990 to try to get a gun. He said "guy" was a slang term for gun. He admitted that he had written the letter and signed it "Ruthless Rich."

"9/27/90

Say Cuz you got to Come up with a Guy & quick, Go Get your Grandmas Guy again before these people send us off. Once they send us off you know you ain't going see us no more So Get Busy. Everything is legit we got a Good rope put the Guy & a Bottle of wine inside a sock, Shelia you Got to let us Know whats up cause time is running out for us. Cuz you & Beverly is the only one's we can depend on & if you 2 don't Come threw for us we ain't got Nobody Else. Check with Boo & Tadda about a Guy & if they slow playing Go Get your Grandma or Buy one on the first at a pawn shop. My Birthday is October 7th & I don't wanna be locked up in here on it, thats 9 days from now So whats up cuz? Write Me oon as you read this letter & if you Get that Soon come by here & Blow 3 times. I know you can come up with one if you really try. Later! Cuz!

Ruthless Rich"

There was no objection at trial to these comments by the prosecutor, and no error. The statement was within the permissible range of comment upon the evidence in closing argument.

¶ 57 The prosecutor's comment, "What does Richard say after that? No witnesses, no witnesses," was fair comment on the testimony. Mr. Reeves said that the shorter one came out of the restroom, said "No witnesses," pointed a gun at him, asked for his money, and took his billfold. Hammon testified and admitted under oath at this re-sentencing trial that he was indeed the one who took Mr. Reeves' billfold at gunpoint that morning. On cross examination Mr. Reeves agreed that it might have been Mr. Jones who made the statement. The prosecutor read his 1991 testimony to him: "Question: Could you be mistaken as to who said no witnesses? Could it have been this man [indicating Jones] as opposed to the shorter man?" His answer was, "No, the small one said it." He may not be as sure now as he was when he testified six years earlier, but a reasonable conclusion is that according to Mr. Reeves, Hammon said "No witnesses." There was no error in this argument.

¶ 58 Hammon complains that the prosecutor's closing argument about his being housed in the "H" cell block, which was death row, and contained the 125 most dangerous prisoners out of 10,000, was not based on the testimony. Actually Hammon agreed in his testimony with this statement and that he was one of the worst prisoners down there. He said, "At that time I was." He was referring to the time when he participated in an uprising in "H" cellblock.

¶ 59 Hammon's brief says the prosecutor misquoted the law when he said, "They don't want you to hold Richard Hammon as responsible as Benny Jones, even though the law says he is." Title 21 O.S.1991, § 172 says:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

Thus the law was stated correctly and no error occurred. In fact, Hammon apparently agreed with the prosecutor, because Hammon had testified on cross examination, "I ain't blaming it all on Benny, Like I say, I'm just a responsible as he is."

¶ 60 Hammon also complains about the prosecutor calling him a "taker" and a "robber" during closing argument. "Taker" appears to be a mild but not inaccurate description of Hammon who admitted stealing from Mr. Slape during the armed robbery, having taken Mr. Reeves' billfold at gunpoint, and having been convicted of two counts of robbery. "Robber" is also accurate. There was no prosecutorial misconduct here.

¶ 61 Hammon says the prosecutor argued that he was lying. He complains about the prosecutor's comment in closing argument, "He [Mr. Eugene Slape] didn't get to have seven years to read his testimony over and over and over and over again ... where he could get up there and shade things to where he didn't do very much." He did not call Hammon a liar. We have said, "[I]t is permissible to comment on the veracity of a witness when such is supported by the evidence." *Smallwood v. State*, 1995 OK CR 60, ¶ 37, 907 P.2d 217, 229, *cert. denied*, 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996).

¶ 62 Hammon complains that the prosecutor stated his personal opinion of why the death penalty was appropriate and exhorted the jury to convict on the grounds of "civic duty." Hammon does not cite to the transcript where "civic duty" was mentioned. No error occurs when the prosecutor argues why the death penalty is appropriate in a particular case. *Toles v. State*, 1997 OK CR 45, ¶ 65, 947 P.2d 180, 193, *cert. denied*, 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998). We held in *Mitchell v. State*, 1994 OK CR 70, ¶ 44, 884 P.2d 1186, 1202, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995):

"Both prosecutors talked about the demands of justice in this case, and one

quoted Mitchell's taped statement that whoever committed this crime deserved the death penalty. Prosecutors should not express a personal opinion or hold a jury to their personal standards of justice. However, these comments were not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld."

Hammon failed to object to these alleged errors at trial thus waiving all but plain error, and we do not find plain error in this record.

¶ 63 Hammon accuses the prosecutor of improperly bolstering OSBI Agent David Page's testimony. Hammon did not object and has waived all but plain error. *Smallwood*, 1995 OK CR 60, ¶ 38, 907 P.2d at 229. Listing the witness's credentials is not the same as indicating a personal belief in the witness's credibility. No plain error occurred as the prosecutor did not improperly bolster the witness's testimony. *Freeman v. State*, 1994 OK CR 37, ¶ 18, 876 P.2d 283, 288, *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994).

¶ 64 Hammon claims the combined effect of the prosecutor's remarks deprived him of a fair trial, even when all of the instances were not objected to. We find that the prosecutor's remarks did not contribute to the verdict or deprive Hammon of a fair trial. *Spears v. State*, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445, *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). This twelfth proposition of error is denied.

## 13.
## CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 65 In Proposition Thirteen, Hammon asserts that he was denied effective assistance of counsel for several reasons. To successfully prove ineffective assistance of counsel, Hammon must show that defense counsel's performance was deficient and that the trial was rendered unfair and the verdict rendered suspect or unreliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993).

¶ 66 Hammon first asserts that his trial counsel failed to use a peremptory challenge to excuse Juror Lawley who expressed serious reservations about her ability to impose a life sentence. She said she would listen but would really have to study it hard. However, she also said it would be just as hard for her to consider the death penalty as it would to consider life imprisonment. Clearly trial counsel was aware of the position of Juror Lawley on the death penalty, and it was his strategy to remove other prospective jurors who would be less favorable to his client on the death penalty option. As in *Childers v. State*, 1988 OK CR 259, ¶ 16, 764 P.2d 900, 904, the defendant has not established deficient performance or prejudice.

¶ 67 Hammon claims his trial counsel failed to investigate, use, and prepare evidence, particularly to prepare witness Fred Cook, unit manager from Oklahoma State Penitentiary (OSP). Counsel effectively used Cook to establish that Hammon's behavior improved after he was separated from Benny Jones. There is no showing of lack of preparation of the witness. Further preparation of Mr. Cook could not have changed the facts, and he was the most credible witness who knew the facts favorable to Hammon.

¶ 68 Counsel was not ineffective for not calling Jones as a witness. Counsel brought credible OSP employees to testify. Counsel was effective in separating Hammon from Jones in his image to the jury. Calling Jones as a witness would have defeated that sound objective. Counsel established that Jones, not Hammon, was the shooter. Jones's testimony would have added nothing to that proof.

¶ 69 Failure to obtain more specific testimony about organic brain damage was not error in view of the effective testimony of Dr. Reynolds. He tested Hammon in 1993 and again in 1996 and gave his results at trial. There is no indication that more information about the origins of Hammon's mental condition would have affected the jury determination of a proper sentence.

¶ 70 Hammon filed a separate motion for an evidentiary hearing on his Sixth Amendment claims of ineffective assistance of trial counsel under Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998). The matters set out in his motion for evidentiary hearing include: (1) trial counsel should have called co-defendant Benny Jones as a witness; (2) counsel should have presented more evidence of Hammon's organic brain impairment from Dr. Reynolds, who testified at the re-sentencing trial, from a neurologist, and from friends and relatives who would describe Hammon's slowness and occasional epileptic seizures; (3) trial counsel should have prepared, presented, or attacked witnesses David Meeks of the Muskogee jail and Fred Cook of Oklahoma State Penitentiary; and (4) failure to present evidence of Hammon's drug and alcohol use. None of these suggestions from appellate counsel about how the case should have been tried present any new issues which show ineffectiveness of trial counsel to an extent that any additional investigation or evidentiary hearing would be helpful. Most of these issues have already been raised in Hammon's direct appeal and discussed in this opinion.

¶ 71 We have already discussed counsel's decision not to call Jones. We have already discussed Dr. Reynolds' testimony. Defense counsel presented several mitigation witnesses, including family, friends, and coaches. The jury was told about Hammon's epileptic seizures. Several relatives signed affidavits saying they could have testified for Hammon if only his lawyer had asked them. None of them say they volunteered their information to the trial lawyer. As a sound trial strategy the trial attorney may wish to avoid cumulative and redundant witnesses. This may be a particular problem when those who know him best, coaches and family members, testify that they believe Hammon is a good athlete, while the tests of his expert, Dr. Reynolds, say he is not.

■ ¶ 72 We have no reason to question the strategy of trial counsel not to raise an affirmative defense of intoxication from alcohol or illegal drug use. Trial counsel may have been aware that the voluntary intoxication defense is available only to specific intent crimes. Hammon was charged with a general intent crime, Felony–Murder during Robbery with a Dangerous Weapon. *Traxler v. State*, 96 Okla.Crim. 231, 251 P.2d 815, 836 (1953) ("Our statute does not in terms make intention a necessary element of robbery.... [O]ur definition is more limited than the common law definition and ... no intent is necessary except the intention of doing the act denounced by the statute. ... No state of mind or belief is involved."); *Grayson v. State*, 1984 OK CR 87, ¶ 5 & n. 1, 687 P.2d 747, 749 & n. 1 (jury ... may not consider intoxication in arriving at verdict as to Robbery with Firearms); *Kreijanovsky v. State*, 1985 OK CR 120, ¶ 9, 706 P.2d 541, 544 (voluntary intoxication is available as a defense only when the crime with which the defendant is charged has as its mens rea element a specific criminal intent or a special mental element); *Hopkins v. Reeves*, 524 U.S. 88, 98, 118 S.Ct. 1895, 1902, 141 L.Ed.2d 76 (1998) (to support a sentence of death, Nebraska felony murder definition needs no other mens rea requirement than the intent to commit the underlying felony); *Lambert v. State*, 984 P.2d 221, 1999 OK CR 17, ¶ 43, 984 P.2d 221, 234–235 (lists elements of Oklahoma First Degree Felony Murder while committing Robbery with a Dangerous Weapon); 21 O.S.Supp.1990, § 801 (Robbery with Dangerous Weapon statute); 21 O.S.Supp.1990, § 701.7(B) (capitol First Degree Felony Murder statute).

¶ 73 Hammon's proffered evidence has failed to rebut the strong presumption that counsel was effective and has failed to demonstrate that an evidentiary hearing is necessary. *Mayes v. State*, 1994 OK CR 44, ¶ 124, 887 P.2d 1288, 1316, *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). Therefore, we reject his motion for an evidentiary hearing on ineffective assistance of counsel.

¶ 74 As Hammon has failed to meet the threshold requirements of *Strickland* and *Lockhart* his proposition thirteen is denied.

### 14.
### AGGRAVATING CIRCUMSTANCE— CONTINUING THREAT TO SOCIETY

■ ¶ 75 In Proposition Fourteen Hammon objects that improper evidence was

admitted against him in support of the "continuing threat to society" aggravating circumstance. Evidence of prior bad acts ·by the Defendant was properly admitted to show his recurring use of violence and association with firearms and to show that he was a continuing threat to society. His shooting of Ms. Thierry was properly used to show his continuing use of firearms resulting in injury to others. Hammon's prior violent felony convictions were properly admitted to show "continuing threat." *Hain,* 1996 OK CR 26, ¶ 36, 919 P.2d at 1141; *Woodruff v. State,* 1993 OK CR 7, ¶ 97, 846 P.2d 1124, 1146, *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1994).

¶ 76 Hammon had threatened to shoot and did shoot Stella Thierry. He shot Danny Richardson. He was convicted May 9, 1990, of Feloniously Carrying a Firearm and Assault in Okmulgee County. He was convicted November 7, 1989, of Assault and Battery with a Dangerous Weapon in Okmulgee County. He wrote a letter to get a gun to carry out an escape from jail. Evidence was presented showing he was a danger to other inmates and to guards at OSP.

¶ 77 This evidence, together with his planning and participation in the subject crime, was sufficient to support the jury's finding that he would commit future acts of violence constituting a continuing threat to society. Hammon's fourteenth proposition of error is without merit and is denied.

### 15.
### JURY INSTRUCTION ON CONTINUING THREAT TO SOCIETY

■■■ ¶ 78 In Proposition Fifteen, Hammon argues that misinstruction of the jury as to the findings necessary to support the continuing threat aggravating circumstance failed to adequately narrow the jury's discretion as required by the Eighth Amendment. In this case the trial court issued Instruction No. 4–74 OUJI–CR (2d) (1997 Supp.).

¶ 79 We first note that counsel did not object to the giving of this instruction, nor did he request alternative instructions. Therefore, we review for plain error only. *Simpson,* 1994 OK CR 40, 876 P.2d at 693.

We find that the instructions in this case, when read in their entirety, accurately stated the law. *See* 21 O.S.1991, § 701.12(7). The Uniform Instructions shall be used unless the court determines that the instruction does not accurately state the law. 12 O.S.1991, § 577.2. Because the uniform instruction is based on the language of the statute, we find there is no error in the instruction. It correctly performs the narrowing processes necessary to be constitutionally acceptable.

### 16.
### JURY WAS NOT TOLD IT COULD CONSIDER SENTENCE OF LIFE OR LIFE WITHOUT PAROLE EVEN IF IT FOUND AGGRAVATING CIRCUMSTANCE

■■■ ¶ 80 In Proposition Sixteen, Hammon claims that the trial court's deviation from Instruction No. 4–80, OUJI–CR (2d) (1997 Supp.), created a risk that his sentence of death was imposed in violation of the constitution. OUJI Instruction 4–80 reads,

"If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole." (Emphasis omittted.)

¶ 81 The trial court omitted the last sentence which informs the jury that it may give a sentence of less than death regardless of its weighing of aggravating circumstances versus mitigating circumstances. Trial counsel did not object to the instruction as given, nor did he request that the last sentence be included. Therefore, we review for plain error only. This Court held in *McGregor v. State,* 1994 OK CR 71, ¶ 40, 885 P.2d 1366, 1384, *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995):

"A life sentence may be given notwithstanding a jury finding of aggravating cir-

cumstances which outweigh mitigating circumstances, but an instruction on this point is not required. This argument has been consistently rejected by the Court."

We find that the failure to include the last sentence of Instruction 4–80 did not amount to plain error.

## 17.
## INSTRUCTIONS ON MITIGATING EVIDENCE

■■■ ¶ 82 In Proposition Seventeen, Hammon claims that the trial court erred in omitting two mitigating circumstances from his requested mitigating circumstances instruction: (1) "Richard Hammon did not shoot, nor shoot at Brad Slape," and (2) "Richard Hammon has received excellent inmate evaluations in the highly structured prison environment and will remain in prison for the rest of his life."

¶ 83 The trial court gave Instruction No. 4–79, OUJI–CR (2d) (1996), which includes the sentence, "In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." The trial court included a list of mitigating circumstances as well as the above sentence, but did not instruct on the two requested mitigating circumstances mentioned above. We find that the trial court modified the list only to the extent it was not supported by the evidence, but the court did not restrict the presentation of mitigating evidence.

¶ 84 It is clear that Hammon had an opportunity to and did indeed present mitigating evidence. The court's instructions adequately reflected the mitigating evidence in this case, and the trial court did not abuse its discretion in modifying Hammon's requested instruction. Error did not occur. *See Ochoa,* 1998 OK CR 41, ¶ 71, 963 P.2d at 605.

## 18.
## SAME EVIDENCE SUPPORTING TWO AGGRAVATING CIRCUMSTANCES

■■■ ¶ 85 Hammon claims in Proposition Eighteen that the aggravating circumstances of "prior conviction of a violent felony" and "continuing threat" were duplicitous and cumulative. He claims that the same evidence (facts and circumstances surrounding prior convictions) was used to support both aggravating circumstances. We have held that the State may use the same evidence, a prior felony conviction, to support these two aggravating circumstances as long as the prior conviction covers different aspects of Hammon's conduct. *Cannon v. State,* 1998 OK CR 28, ¶¶ 56–57, 961 P.2d 838, 852.

¶ 86 We find that the evidence covered separate and distinct aspects of Hammon, his past violent felony convictions, and the probability that he would continue to commit violent acts in the future from which society would need protection. *Allen v. State,* 1994 OK CR 13, ¶ 77, 871 P.2d 79, 100–101, *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994). Therefore, there is no error here.

## 19.
## EVIDENCE SUFFICIENT TO SUPPORT DEATH SENTENCE

¶ 87 In Proposition Nineteen, Hammon argues that if we find that any of the aggravating circumstances were not supported by the evidence, then we should overturn his sentence of death. We have found herein that there was sufficient evidence to support the aggravating circumstance of murder for the purpose of avoiding lawful arrest (Proposition Three); the great risk of death aggravating circumstance (Proposition Four), and the prior violent felony aggravating circumstance (Proposition Five).

¶ 88 Further we have found that the aggravating circumstance of the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society was supported by the evidence of this particular offense and Hammon's history of violent behavior in the past. (See Proposition Fourteen.)

¶ 89 The mitigating evidence was summarized into an instruction for the jury to consider, and the jury was advised: "In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." After reviewing the record and carefully weighing the

aggravating circumstances and the mitigating evidence, we find the jury's determination that the aggravating circumstances outweigh the mitigating circumstances is amply supported by the record. Therefore, we can say with confidence that the evidence was sufficient to support the sentence of death. Hammon's nineteenth proposition is denied.

### 20.
### EXECUTION OF MENTALLY RETARDED PERSONS

¶ 90 In Proposition Twenty, Hammon asks this Court to make new law. He asks this Court to vacate his death sentence because the execution of a mentally retarded person is cruel and unusual punishment. Hammon points out that twelve (12) states have enacted laws prohibiting or restricting the execution of the retarded. Hammon's expert witness at trial stated that he had given him an IQ test in 1993 which indicated a verbal score of 74 and an overall score of 67, which he characterized as "mildly retarded." He admitted that in 1976 the Okmulgee County Health Department had tested Hammon and given him a full-scale IQ of 76.

¶ 91 Hammon concedes that the Supreme Court of the United States has declined to rule that such an execution constitutes cruel and unusual punishment. Hammon asks this court to be the first court in the nation to make such a determination without a legislative enactment. The fact that 12 out of 50 states have made such a legislative enactment is not a compelling argument that there is a national consensus against these executions sufficient to raise this issue to a constitutional level. This is a legislative matter, not a question of constitutional law, and we therefore refuse to usurp the legislature's prerogative. *Salazar v. State*, 973 P.2d 315, 1998 OK CR 70, ¶ 49, 973 P.2d 315, 329.

¶ 92 Under present Oklahoma law, unchanged since 1910, persons of unsound mind cannot be convicted of or punished for a crime if "at the time of committing the act charged against them they were incapable of knowing its wrongfulness." 21 O.S.1991, § 152. Hammon has not claimed that he comes under the provisions of that statute.

He would have us create new law saying that persons with some degree of mental retardation, yet who are capable of knowing the wrongfulness of their acts, could be convicted of First Degree Murder, but not given the death penalty. Obviously, if he were incapable of knowing the wrongfulness of his acts, he would fall within the provisions of § 152, and he would not need a new law.

¶ 93 It would properly be a legislative function, not a judicial function, to determine whether certain mentally retarded persons could be convicted of capital murder and yet be exempt from the death penalty, to decide what level of retardation would be required, and to define a reliable and objective test that would distinguish those persons entitled to that exemption.

¶ 94 In *Penry v. Lynaugh*, 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989), the United States Supreme Court said:

> "So long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination whether 'death is the appropriate punishment' can be made in each particular case."

¶ 95 This occurred in Hammon's case. A jury heard all of the evidence. The defendant received a fair trial and was represented by competent counsel. This court should uphold the jury determination. No member of this Court is in any better position to judge the facts of this case than the jurors who heard all of the evidence and had the opportunity to view the witnesses and to hear Hammon testify in person. This proposition is without merit.

### 21.
### ACCUMULATION OF ERRORS

¶ 96 In Proposition Twenty–One, Hammon asserts that an accumulation of errors, even if none is sufficient standing alone to warrant reversal or modification, deprived Hammon of a fair trial. After reviewing all such alleged errors, it is the opinion of this Court that Hammon did in fact receive a fair trial. No errors occurred which singly or in

the aggregate would require reversal or modification of this case, and the twenty-first proposition is denied. *Mollett v. State,* 1997 OK CR 28, ¶ 63, 939 P.2d 1, 15, *cert. denied,* 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998).

## MANDATORY SENTENCE REVIEW

¶ 97 Pursuant to 21 O.S.1991, § 701.13(C), we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. As noted above, sufficient evidence existed to support the four aggravating circumstances alleged by the State and found by the jury in the re-sentencing trial: (1) The defendant was previously convicted of a felony involving the use or threat or violence to the person; (2) the defendant knowingly created a great risk of death to more than one person; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In mitigation, Hammon presented evidence that, (1) he did not personally shoot or kill Eugene Slape; (2) he did not personally shoot Charles Reeves or Richard Dix; (3) he is mildly retarded and is easily influenced by others; and (4) he has apologized to the family of Eugene Slape for his role in the robbery which resulted in the murder of Eugene Slape.

■■■ ¶ 98 After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate. We further find no error which warrants reversal or modification of the sentence.

1. *See Lambert v. State,* 1999 OK CR 17, 984 P.2d 221 (Judge Chapel, concurring in part and dis-

## DECISION

¶ 99 The sentence of death upon re-sentencing is hereby **AFFIRMED.**

LUMPKIN, V.P.J., and JOHNSON, J., concur.

STRUBHAR, P.J., and CHAPEL, J., dissent.

STRUBHAR, Presiding Judge: Dissents.

¶ 1 I dissent. I cannot vote to uphold the sentencing of death without first addressing the issue of the constitutionality of executing a mentally retarded person.

¶ 2 This Court should recognize there is a growing list of states that prohibit the executions of mentally retarded persons and that Oklahoma, now presented with this issue, should address this proposition.

¶ 3 The Opinion issued by the majority states that this is an issue only for the legislature. I believe otherwise and am concerned that we failed to address the issue in this case.

CHAPEL, Judge, Dissents:

¶ 1 For several reasons, I cannot vote to uphold the sentence of death in this case. For one, in so far as the Oklahoma death penalty scheme permits the execution of a mentally retarded person, it violates both the Oklahoma and United States Constitutions.[1]

¶ 2 The majority acknowledges that Hammon squarely raises the issue of the constitutionality of executing a mentally retarded person, but concludes that this is a "legislative issue." It is, of course, often wise for courts to defer to the legislative branch on certain matters. Some issues, however, cannot be deferred. When a court is presented with a properly raised justiciable issue, it must decide the issue. It cannot punt. The notion that the legislature can decide the

senting in part).

constitutionality of its own acts is patently absurd.